48 CCPA

**Application of Paul Hollis TAYLOR.**
**Patent Appeal No. 6618.**

United States Court of Customs
and Patent Appeals.
April 14, 1961.

William Marshall Lee, Byron, Hume, Groen & Clement, Chicago, Ill., for appellant.

Paul Hollis Taylor, pro se.

Clarence W. Moore, Washington, D. C. (S. Wm. Cochran and George C. Roeming, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN and SMITH, Associate Judges, and Judge WILLIAM H. KIRKPATRICK.[1]

RICH, Judge.

This appeal is from the decision of the Patent Office Board of Appeals affirming the examiner's rejection of method claims 22 and 23 in application Ser. No. 409,341, filed February 10, 1954, entitled "Accumulator." Nine claims, each drawn to an "accumulator system," have been allowed by the examiner.

The invention of the appealed claims is predicated on recognition of the fact that energy can be stored upon compression of certain liquids and solids by reason of their polymorphic transition and that the stored energy can be released to perform work. When subjected to sufficiently high pressures, certain materials undergo changes in form resulting in sudden change in volume, the change in volume occurring gradually as pressure is increased until a critical pressure is reached, at which point a relatively large volumetric change may take place in response to a relatively small pressure change. This larger change in volume at a substantially constant pressure is known as a polymorphic transition. Additionally, the polymorphic transition phenomenon must be reversible so that a previously compressed material will return to its initial higher-volume state in response to pressure reduction. This expansion of the material attendant upon the pressure decrease is the source of energy that appellant uses to perform work.

To illustrate, one of the materials disclosed by appellant is silver iodide which he says abruptly compresses, at a constant pressure of 42,600 pounds per square inch, from the 1.1% reduction in volume it has then undergone as pressure rose from zero to a reduction in volume of 17.4%. This, appellant says, is a volume reduction of 16.3% under substantially constant pressure conditions. Upon slight reduction from the transition pressure the volume returns to what it was. Appellant, however, makes no claim to the discovery of this phenomenon, but attributes it to Professor P. W. Bridgman of Harvard University, author of the references.

Claims 22 and 23 are substantial duplicates, each reciting three basic steps. We have broken claim 23 into its three basic steps for purposes of discussion. It reads:

"A method of storing and utilizing energy in a work performing system through the medium of a non-gaseous material capable of polymorphic transition at a substantially constant pressure, comprising the steps of

"[A] reducing the volume of the non-gaseous material at substantially said constant pressure to cause polymorphic transition to thereby store energy,

"[B] subsequently reducing the pressure on said non-gaseous material below said constant pressure to cause reverse polymorphic transition to thereby expand the material, and

"[C] concomitantly applying the energy of expansion of the material to work performing means in said system."

The application discloses specific accumulator devices so constructed as to utilize the energy released by expanding, previously-compressed, polymorphic transition materials. Accumulators, in general, are devices which store me-

**1.** United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate *in place of*

*Judge O'Connell,* pursuant to provisions of Section 294(d), Title 28 U.S.C.

chanical energy to supply peak demands and provide pressure leveling in hydraulic systems, and commonly use compressed gases as the energy storage medium. Each of appellant's accumulators has a heavy-walled compression chamber, containing a polymorphic transition material, connected to a hydraulic system. Pressure changes in the hydraulic system are transmitted from the hydraulic fluid to the compressible material. The accumulator is charged, i. e., the material is compressed to its lower-volume state, by the static pressure in the accompanying hydraulic system, or by pressure from an external source. It can be charged readily by such means as a conventional hand pump, and it may be stored in a charged condition indefinitely, so appellant says. In each instance, when the charging pressure drops below the critical transition value, the expanding material either pushes a piston, or a flexible diaphragm, or acts directly on the hydraulic fluid, in the case where it is in direct contact therewith, exerting sufficient force to do substantial work.

Various advantages are said to flow from the utilization of accumulators having polymorphic transition material as the energy storage medium, such as an increased amount of available energy for a given volumetric change; weight, size and cost reductions; and the release of energy at a substantially constant pressure.

The examiner, in his final rejection, and the board in affirming that rejection, relied on three references which were made of record by appellant. They are:

"Bridgman—Proceedings of American Academy of Arts and Sciences—Volume 76, No. 1, pages 2-7, February 1945.
"Bridgman—Proceedings of the American Academy of Arts and Sciences—Volume 76, No. 3, pages 71-87, March 1948.
"Bridgman—Proceedings of the American Academy of Arts and Sciences—Volume 77, No. 4, pages 127-128, 131-134, February 1949."

The references disclose an extensive series of compressibility tests on a wide variety of liquids and solids, including test results in tabular and graphic form and a general discussion of the test results. The articles amply testify to Professor Bridgman's recognition of the compressibility of certain solids and liquids and of the fact that this compression may include a polymorphic transition. Professor Bridgman's experiments included testing silver iodide, one of applicant's preferred materials, and in Volume 76, February 1945, at page 5, a graph of volume decrements for certain iodides shows an easily recognizable large polymorphic transition for that material.

Generally speaking, Professor Bridgman's test results were obtained by applying incremental pressure increases and taking corresponding volume readings for each pressure increase after allowing sufficient time for any heat of compression to dissipate. Decreasing pressure runs were also made. While the exact procedure for each of the tests is not disclosed, Professor Bridgman, at one point, indicates that 43 readings for both increasing and decreasing pressures were taken and throughout the articles it is noted that the difference, at corresponding pressures, between volume readings for increasing and decreasing pressures, was consistently small.

While the test equipment used for the earlier experiments is not thoroughly described in the articles, the February 1949 article illustrates and describes a later used testing device. That device has a heavy steel cylinder in which is placed the material whose compressibility is to be measured. Pressure is applied to the material by a piston and the article says that change in volume is "given directly by the motion of the piston measured by a dial guage graduated to 0.001 inch and reading by estimation to 0.0001 inch." The piston which is in direct contact with the material is driven by a larger force-multiplying piston which in turn is driven by a conventional hand pump connected to the larger piston through a

dead weight piston gauge. Accurate pressure readings are obtained by adjusting the dead weight gauge and operating the pump until the weight floats.

In his Answer, the examiner urged that the claimed steps of compressing the material and of releasing the pressure (steps [A] and [B]) were admittedly old and disclosed by Bridgman. The third step [C], that of applying the released energy to means to perform work in the system, was said to "constitute applicant's basis for patentability" and was, in the opinion of the examiner, only a matter of mechanical skill, and not an "inventive" step. The examiner commented:

"In practically all kinds of motors, such as electric, internal combustion, [and] steam engines [,] energy is produced and released, the released energy being applied to means for performing work.

"In response to applicant's argument it is admitted that the work of Bridgman was purely research, however it is submitted that the broad step of utilizing the produced energy merely constitutes an obvious expedient which is not patentable."

The board did not pass on the examiner's contention that the claimed third step would be obvious, choosing instead to hold in effect that the claims fail to distinguish patentably from the operation of Bridgman's test equipment. The board said:

"It is clear that Bridgman not only compressed and released the various substances tested but also that he observed the behavior thereof during increasing and decreasing pressure sequences. It appears to us that it is an inherent and unavoidable incident of the operation of the Bridgman test equipment that the material be compressed through transition, released to reverse transition, *and that energy be recovered therefrom in the form of forces acting on the equipment.* The broad recitations of claims 22 and 23 as to

'work performing system' and the application of expansion to the work performing means in said system, are so generally stated as to fail to define over such a test procedure. *The work recovery need be nothing more than the retraction of the compressing piston to satisfy the terms of these claims.*" [Emphasis ours.]

As to claim steps [A] and [B], appellant does not assert that he discovered the compressibility of non-gaseous materials or that he discovered polymorphic transition. After carefully considering his arguments, it is not apparent to us that he is seriously contending that he alone recognized that polymorphic transitions involve energy transfers. His brief says:

"In essence, what appellant has done is to *recognize* the tremendous *advantages* of, and to *devise a novel method for utilizing* the large amounts of energy available at a constant pressure from reverse polymorphic transition." [Emphasis ours.]

This alleged recognition and utilization seem to be the bases on which we are asked to find that the third step of the claims renders the claimed method patentable.

We agree with the board that the language of the third step is broad and that the claimed method is inherent in the operation of Bridgman's test apparatus. Bridgman's experiments, involving, as they did, observations for both decreasing as well as increasing pressures, carried out the claimed method. As a necessary part of obtaining the test results, the pressure decrements were produced deliberately to determine the volume change as the compressed material expanded. The resulting piston movement was, in our opinion, the application of "the energy of expansion of the material to work performing means * *." Appellant argues that Bridgman never used the energy, or, as a practical matter, never realized that energy was available during the reverse polymorphic

transition and that it would be "erroneous speculation" to affirm the board's conclusion that dissipation of energy to obtain test results is equivalent to *practical* utilization of this energy. The claims do not require that the work performed be either practical or useful.

We have been referred by appellant to Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 22 S.Ct. 698, 46 L.Ed. 968, but find that case not in point. The process there involved was not, in fact, carried out by the allegedly anticipatory prior art. To the contrary, the prior art apparatus would have required alterations before it was capable of carrying out the claimed process and such alterations were suggested only by the concept disclosed in the patent in suit.

We also find merit in the examiner's rejection for obviousness, which the board did not reverse. Appellant says, in essence, that this rejection was made with hindsight and with knowledge of applicant's work. He asks that we be not influenced by the extreme simplicity of the process as simplicity does not negative patentability. While these are proper arguments, they are without persuasion where all that can be relied on in support of patentability is the broad concept of "applying" available energy "to work performing means," as claim 23 says, or of "applying the released energy to means for performing work," which is the alternative language of claim 22. The bare concept of using energy to do work by any and all means is, in the nature of things, necessarily in the realm of the obvious, like using fire to heat, the wind to propel a ship, or ice to cool. That the energy was there is obvious and is, moreover, tacitly admitted by appellant in his argument that "the Bridgman tests" resulted in "the complete dissipation *of the stored energy* without any *utilization* of this energy whatsoever." [Emphasis ours.]

As we find ample ground to sustain the decision of the Board of Appeals, it is affirmed.

Affirmed.